IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:18-CR-687 |
| | ) | |
| Plaintiff, | ) | CHIEF JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | |
| | ) | |
| SILVIO LEON, | ) | GOVERNMENT'S RESPONSE TO |
| PABLO ARRECHAVALETA, | ) | DEFENDANTS' SENTENCING |
| | ) | MEMORANDA |
| Defendants. | ) | |

The United States of America, by and through its counsel, Justin E. Herdman, United States Attorney, and Elliot Morrison, Assistant United States Attorney, hereby responds to Defendants' sentencing memoranda (R. 36 (Leon); R. 37 (Arrechavaleta)).

**I.    FACTUAL BACKGROUND**

The PSR provides a detailed and accurate recitation of the facts of these offenses. The government will furnish additional evidence if necessary at the sentencing hearing, in the form of the testimony of the case agent. The government here briefly responds to several factual misstatements in Defendants' sentencing memoranda.

Both Defendants claim, in identical terms, that they pulled the thousands of accounts on the trip in which they were arrested searching for a select few credit card accounts—that they were "only looking for credit card numbers that had a Sam's Club membership associated with them." (R. 36: Leon Mem., PageID 298; R. 37: Arrechavaleta Mem., PageID 319.) Leon goes further, claiming that "only 2 of the 4,900 card numbers contained the information Silvio sought" (those belonging to F.V. and J.A.), and that he thus "had no further contact with the remaining

4,898 card numbers." (R. 36: Leon Mem., PageID 298.)  Neither contention can be reconciled with the evidence.

Defendants traveled to dozens of cities, principally in Pennsylvania and Ohio, and stole hundreds or thousands of accounts in each area.  They were not searching for cards already associated with Sam's Club, let alone associated with two particular names of Sam's Club members.  F.V. and J.A. were fictitious names Leon used to obtain fraudulent Sam's Club memberships—and Defendants had with them at the time of their arrest a fake driver's license to further this fraud.  Memberships at Sam's Club are required to shop, not to pay.  So Defendants' used countless unwitting victims' credit card accounts to make their purchases, often making multiple purchases on different cards in a single trip—without any regard for who that victim was or whether they had a Sam's Club membership.

Take, for example, the February 2018 trip to the Cleveland, Ohio area that brought them to the Mentor Police Department's and FBI's attention.  On that trip, they were using the F.V. membership for their Sam's Club purchases. They made 29 separate fraudulent charges totaling more than $13,000 in just four days, from February 9 to 12.  On February 10, for example, they made two purchases at the Sheffield Village store, one at the Sandusky store, and four at the Mentor store—using a different card for each transaction, and spending more than $2,500 of other peoples' money at Sam's Clubs alone that day.

That pattern repeats on the trip for which Leon claims that he used only two of 4,900 of the accounts recovered.  They began on June 8, 2018, in Harrisburg, Pennsylvania, by then using the J.A. membership.  Between June 8 and June 11, they fraudulently charged more than $8,200 in 27 transactions at eight stores between Harrisburg and Cleveland, before they were arrested on the morning of June 12.  They used far more than two credit card accounts on that trip.  None of

2

those accounts belonged to the two fictional Sam's Club members.  Instead, those accounts belonged to real people who had innocently swiped their credit cards at their local gas stations not knowing that Defendants would charge hundreds of dollars in their names—like the real people whose reports of large fraudulent charges in February 2018 helped investigators identify Defendants and discover at least the Sam's Club portion of this wide-ranging scheme.

Moreover, Defendants would limit the estimate of the actual and intended losses to only the purchases they successfully made at Sam's Club stores and nowhere else.  But it is undisputed that they made fraudulent purchases at other retailers, as they have admitted in their plea agreements, and consistent with agents' finding recently purchased merchandise from other retailers at the time of the arrest.  The Sam's Club purchases are just the ones that are feasible to aggregate because they are associated with the fraudulent memberships known to law enforcement.

## II.  LEGAL ARGUMENT

The central legal issue in dispute is the loss amount under § 2B1.1 of the Guidelines, but two other issues merit brief discussion.

### A.  NUMBER OF VICTIMS

The PSR correctly applies the enhancement under § 2B1.1(b)(2)(A) for 10 or more victims.  Leon's argument relies on his incorrect contention that that there are only two victims in this scheme.  That premise is false for the reasons stated above.  Further, at a minimum, dozens of banks have paid out fraudulent charges.  Nor is there any basis in the law to doubt that the many thousands of people who had their account information stolen were victims of this broad-ranging scheme.  Defendant's legal argument that not every account possessed with intent to defraud was "used" is self-defeating, since he "used" at least 10 accounts on every trip he took even under his own definition.

B. ROLE IN THE OFFENSE

The PSR also correctly applies a § 3B1.1 4-level aggravating role enhancement to Leon and correctly declines to apply a minor role adjustment to Arrechavaleta. Leon was the clear leader of a scheme that was breathtaking in scope—in terms of time, geography, money, and the number of victims. Leon was the old hand. At the start of this scheme, he was still on federal supervised release based on his 18 U.S.C. § 1029 conviction for a similar credit card skimming scheme. He was the one renting the cars and booking most of the flights—organizing the trips, in other words—and he appears to have recruited Arrechavaleta to join the scheme as soon as Arrechavaleta got out of prison on his own prior federal armed robbery conviction.

The full 4-level enhancement is also appropriate because of the scope of the scheme. There appear to be at least five participants, with Leon the one constant. Just for the brief window in which the FBI was catching onto the long-running scheme and able to obtain surveillance, at least two others are viewed on surveillance assisting with purchases. Further, they also were regularly sending the gift cards back to at least one confederate in Miami, as is typical in these schemes, and consistent with their possession of mailing envelopes when they were arrested. Even if there were not five participants, this is exactly the type of scheme that is considered "otherwise extensive." *See* U.S.S.G. § 3B1.1 n.3 (providing the example that "a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive"). Here, Defendants converted countless gas stations and their workers into unwitting participants, and the identity theft victims were unknowingly giving over their credit card accounts for Defendants to use to defraud the card-issuing banks that suffered the vast majority of the financial loss. The scheme was also extensive in terms of the geographic spread, the number of retail establishments.

4

Arrechavaleta's argument for a mitigating role is contrary to his plea agreement stipulations (*see* R. 29, PageID 162 (permitting argument on aggravating role, not mitigating role)) and the law.  True enough, Leon was the leader of the scheme.  But the mere presence of a leader does not render Arrechavaleta "substantially less culpable than the average participant in the criminal activity," as is required to be deemed a minor participant.  *See* U.S.S.G. § 3B1.2, n.3.  Arrechavaleta participated in the vast majority of the Sam's Club purchases, and was regularly traveling from Miami to the areas they were victimizing.  Even if he was less culpable than Leon, Arrechavaleta was actually more culpable than the *average* participant when considering the coconspirators who were Leon's less frequent skimming and shopping accomplices and their confederates receiving packages of gift cards in Miami.  In sum, Arrechavaleta's missing out on the early months of the conspiracy because he was incapacitated by the Bureau of Prisons is an argument for an upward variance, not for a minor role.

    C.    <u>LOSS AMOUNT</u>

For the reasons stated in the government's objection to the loss amount calculation, the government submits that the loss amount under § 2B1.1(b)(1) is understated.  In sum, the loss amount found in the PSR includes the stolen credit card accounts possessed only on the final June 2018 trip.  That is a snapshot of the trip on which they were arrested, not an aggregation of all of the relevant conduct, as the Guidelines require.  Defendants had made dozens of such trips before they were caught.  Each time they harvested thousands of stolen credit card accounts.  It is true that the exact amount cannot be known, but the government respectfully disagrees with the PSR's conclusion that they cannot be estimated.  Estimating is often necessary in calculating loss amounts of drug weights.  As explained in the objection section of the PSRs, a fair estimate would be that Defendants stole at least 30,000 accounts, resulting in an intended loss of at least

$15 million.  As a result, the government submits that a 20-level increase for loss amount, rather than the current 16-level increase, is the correct adjustment under § 2B1.1(b)(1).

The core of Defendant's objection is to the manner of calculation spelled out in the Guidelines commentary—counting $500 per stolen credit card account when the amount actually intended to be stolen is unknown pursuant to § 2B1.1(b)(1), n. 3(F)(i).  As both Defendants now admit, at the time they signed their plea agreements, using $500 per stolen account was proper.  But citing *United States v. Havis*, 927 F.3d 382 (6th Cir. 2019) (*en banc*), they argue that the *en banc* Sixth Circuit has upended all interpretations of the Guidelines based on application notes, at least where those notes favor the government's position.  In *Havis*, the Court considered the scope of the definition of a "controlled substance offense" under § 4B1.2.  The Court found that § 4B1.2 provides a definition of the term in the main text, and that the application notes then modify that definition—adding to the category of controlled substance offenses *attempts* to commit controlled substance offenses, and thus modifying the definition.  927 F.3d at 385-87.

The government recognizes that *Havis* is binding on this Court and could call into question prior panel decisions of the Sixth Circuit, but *Havis* does not compel the result that Defendants seek.[1]  Defendants' reading of *Havis* has surface appeal insofar as *Havis* casts doubt on the validity of Guidelines application notes in some circumstances.  But Defendants' contentions miss the mark.  Guidelines application notes have, for decades, helped courts interpret the Guidelines.  *Havis* carved out an exception to their reach when a note goes beyond

---

[1]  In addition, the government does not concede that *Havis* was correctly decided.  Should the Court decide any part of this or any other issue in Defendant's favor based on *Havis*, the government reserves the right to seek further review of that issue based on subsequent reconsideration by the Supreme Court or otherwise, or by seeking a petition for *certiorari* in this case, or joining a petition for *cert.* filed in another case.

interpreting the main text and conflicts with the main text. The main text is required by statute to be submitted for Congress's review, while the notes are not. *Id.* at 385-86. Where the main text provides a definition that Congress is presumed to have approved, and the notes would alter that definition, the *en banc* court held that the notes cannot have such an effect. *Id.* at 386-87. The broader rule is that courts "need not accept an interpretation that is 'plainly erroneous or inconsistent with the' corresponding guideline." *Id.* at 386 (quoting *Stinson v. United States*, 508 U.S. 36, 45 (1993)).

Here, however, there is no such conflict between a definition in the main text and a definition in the application notes, or an interpretation that is "plainly erroneous." The main text speaks broadly of "loss," and the application notes provide a variety of ways to interpret that term depending on the context—with general rules of broad applicability and special rules applicable to specific situations. *See* U.S.S.G. 2B1.1, n. 3. Defendants do not take issue with the use of the application note's rules of broad applicability, effectively conceding that it is permissible for the Sentencing Commission to give form to the word, "loss," in the Guidelines text, including to recognize that loss that is intended but not accomplished is relevant. Defendants appear to argue that *Havis* requires the rejection of some application notes because they add to or conflict not with the main text, but with *other application notes*. But *Havis* is expressly concerned with conflicts between the text and the notes, not between the notes.

The special rules of note 3(F), including the one that applies here, do not conflict with the main text, but instead attempt to address unique or difficult cases for assessing "loss." In credit card skimming cases like this one, the defendants will often be caught red-handed with thousands of thousands of accounts with credit limits well in excess of $500. It is impossible to determine with precision the full extent the scheme they intended to perpetrate but for law

enforcement's intervention, or to quantify the harm caused by compromising a victim's account even without charges to that account. In the absence of a method for estimating that loss that Congress is presumed to have blessed—which is, under *Havis*, absent here—there is nothing improper about the Sentencing Commission providing district courts guidance in calculating the loss in such a situation, as it has for decades.

### III.  CONCLUSION

For these reasons, the government submits that the PSR correctly calculates Defendants' guidelines ranges except insofar as the government submits that a 20-level increase for loss amount, rather than the current 16-level increase, is the correct adjustment under § 2B1.1(b)(1). Defendants' objections to the PSR should be rejected. For these reasons, and for those to be argued at the sentencing hearing concerning the sentencing factors under 18 U.S.C. § 3553(a), in particular, the recidivism of these defendants, a sentence at the high end of the adjusted guidelines ranges is appropriate.

               Respectfully submitted,

               JUSTIN E. HERDMAN
               United States Attorney

By:  /s/ Elliot Morrison
      Elliot Morrison (OH: 0091740)
      Assistant United States Attorney
      United States Court House
      801 West Superior Avenue, Suite 400
      Cleveland, OH 44113
      (216) 622-3919
      (216) 522-8355 (facsimile)
      Elliot.Morrison@usdoj.gov

## CERTIFICATE OF SERVICE

    I hereby certify that on this day, August 19, 2019, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

                                      /s/ Elliot Morrison
                                      Elliot Morrison
                                      Assistant U.S. Attorney